Christopher Michael
**BOULTINGHOUSE,**
**Petitioner,**

v.

**Guillerma HALL, Warden, Respondent.**

**No. SA CV 07–142–AHM(E).**

United States District Court,
C.D. California.

Oct. 8, 2008.

Christopher Michael Boultinghouse, Norco, CA, pro se.

Elizabeth A. Hartwig, CAAG Office of Attorney General of California, San Diego, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

A. HOWARD MATZ, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the First Amended Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge. The Court approves and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment be entered denying and dismissing the First Amended Petition with prejudice.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order, the Magistrate Judge's Report and Recommendation and the Judgment herein by United States mail on Petitioner and counsel for Respondent.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CHARLES F. EICK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05–07 of the United States District Court for the Central District of California.

## PROCEEDINGS

On February 6, 2007, Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody." On February 22, 2007, the Court received from Petitioner a motion to amend the Petition ("Motion") seeking leave to add a new Ground Four alleging that the sentencing court imposed an upper term in violation of *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007) (*"Cunningham"*). The Court rejected the Motion for filing because the proof of service was inadequate and because Petitioner failed to lodge with the Court an original and one copy of the proposed amended Petition, in violation of Local Rule 15–1.

On March 6, 2007, Respondent filed a "Notice of Motion and Motion to Dismiss Petition for Writ of Habeas Corpus" ("Motion to Dismiss"), addressing Petitioner's *Cunningham* claim, although that claim was not contained in the Petition. On March 19, 2007, the Magistrate Judge issued a Report and Recommendation recommending that the Court deny the Motion to Dismiss without prejudice and

grant Petitioner leave to file a motion to amend the Petition and to lodge a proposed First Amended Petition containing all of the claims Petitioner desired to raise in this proceeding. On April 19, 2007, the District Court issued an Order approving and adopting the Report and Recommendation of March 19, 2007.

On May 21, 2007, Petitioner filed a "Motion to Amend the Petition" ("Motion to Amend"), seeking leave to amend and also seeking a stay pursuant to *Rhines v. Weber,* 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). Respondent filed a "Statement of Non–Opposition, etc." to the Motion to Amend. On June 19, 2007, the Magistrate Judge issued an order granting leave to amend and ordering the First Amended Petition to be filed as of the date of lodging, May 21, 2007. On June 21, 2007, the Magistrate Judge issued a Report and Recommendation recommending that the District Court issue an order staying the Petition, ordering Petitioner to file a petition in the California Supreme Court, and ordering Petitioner to notify this Court within forty-five days of the date of any California Supreme Court ruling on that petition. On July 25, 2007, the District Court issued an Order adopting the Report and Recommendation of June 21, 2007.

On October 16, 2007, Petitioner filed a document to which was attached a California Supreme Court petition containing Petitioner's *Cunningham* claim and the California Supreme Court's order of August 8, 2007 denying that petition. On December 28, 2007, Respondent filed an Answer addressing the merits of the First Amended Petition. On January 31, 2008, Petitioner

filed a Reply and an "Addendum to Notice of Lodging, etc."

## BACKGROUND

An Information charged Petitioner with one count of possession for sale of a controlled substance, *i.e.,* gamma-butyrolactone ("GBL"), a felony, in violation of California Health and Safety Code section 11351, and four misdemeanor counts of the unauthorized possession of the controlled substances stanozolol, nandrolone, testosterone and methandrostenolone, in violation of California Health and Safety Code section 11377(a) (Clerk's Transcript ["C.T."] 17–19). The Information further alleged Petitioner had suffered three prior convictions qualifying as "strikes" under California's "Three Strikes Law," California Penal Code sections 667(b)—(i) and 1170.12(a)—(d) (C.T.17–19).[1] A jury found Petitioner guilty of the felony count of possession for sale of GBL and the four misdemeanor possession counts (Reporter's Transcript ["R.T."] 337–40; C.T. 106, 149–52).

Petitioner waived a jury trial of the prior conviction allegations (R.T. 3; C.T. 98). The prosecutor did not produce evidence to support one of the strike allegations, and the court found that allegation not to be true (R.T. 347–48). The court found true the remaining two strike allegations (R.T. 348–49; C.T. 107). Pursuant to *People v. Superior Court (Romero )*, 13 Cal.4th 497, 504–05, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996), the court struck one of these prior conviction allegations (R.T. 367; C.T. 227). The court then imposed an upper term sentence of four years in

**1.** The Three Strikes Law consists of two nearly identical statutory schemes. The earlier provision, enacted by the Legislature, was passed as an urgency measure, and is codified as California Penal Code §§ 667(b)—(i) (eff. March 7, 1994). The later provision, an initiative statute, is embodied in California Penal Code § 1170.12 (eff.Nov. 9, 1994). *See generally People v. Superior Court (Romero),* 13 Cal.4th 497, 504–05, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996).

state prison on the felony count, doubled pursuant to California Penal Code sections 667(e)(1) and 1170.12(c)(1), for a total prison term of eight years (R.T. 368–69; C.T. 227–28).

The California Court of Appeal affirmed the judgment (Respondent's Lodgment 6; [2] *see People v. Boultinghouse*, 134 Cal. App.4th 619, 36 Cal.Rptr.3d 244 (2005)). On March 15, 2006, the California Supreme Court denied Petitioner's petition for review without opinion, but "without prejudice to any relief to which defendant might be entitled after the United States Supreme Court determines in *Cunningham v. California*, No. 05–6551, the effect of *Blakely v. Washington* (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 and *United States v. Booker* (2005) 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, on California law" (Respondent's Lodgment 8).

Petitioner filed a habeas corpus petition in the Orange County Superior Court, which that court denied on May 25, 2006 (Respondent's Lodgments 15, 16). Petitioner filed a second habeas corpus petition in the Orange County Superior Court, which that court denied on August 1, 2006 (Respondent's Lodgments 17, 18). Petitioner filed a third habeas corpus petition in the Orange County Superior Court, which that court denied on October 31, 2006 (Respondent's Lodgments 19, 20). Petitioner filed a habeas corpus petition in the California Supreme Court on November 1, 2006, which that court denied without opinion on May 9, 2007 (Respondent's

Lodgment 21; docket in *In re Boultinghouse*, California Supreme Court case number S147719).[3] Petitioner filed a habeas corpus petition in the California Court of Appeal asserting his *Cunningham* claim, which that court denied on January 26, 2007 without prejudice to the filing of a petition in the Superior Court (Respondent's Lodgment 5 of documents lodged on March 6, 2007).

On February 6, 2007, Petitioner filed the present federal Petition. As indicated above, the Court stayed the Petition pending exhaustion of Petitioner's *Cunningham* claim in the California Supreme Court.

Petitioner filed a habeas corpus petition in the Orange County Superior Court, which that court denied on April 11, 2007 (Respondent's Lodgment 23). Petitioner filed a habeas corpus petition in the California Court of Appeal, which that court denied on June 7, 2007 (Respondent's Lodgments 24, 25). Petitioner filed a petition for review in the California Supreme Court, which that court denied on August 7, 2007 (Respondent's Lodgments 26, 30; Exhibits to Petitioner's letter of October 16, 2007).

## SUMMARY OF EVIDENCE

### I. *Prosecution Case*

Drug Enforcement Administration ("DEA") agent Eric Ball testified that, on March 21, 2002, he and other officers conducted a search of Petitioner's apartment and recovered two boxes containing bottles

---

**2.** Respondent filed two Notices of Lodging, one on March 6, 2007, referencing Lodgments 1 through 5, and a second one on December 28, 2007, referencing Lodgments 1 through 31. Respondent did not number the lodged documents consecutively, causing a confusing overlap in the numbering of non-identical documents. Unless otherwise indicated herein, the Court refers to the lodged documents by the numbering identified in the

Notice of Lodging filed on December 28, 2007.

**3.** The Court takes judicial notice of the docket in *In re Boultinghouse*, California Supreme Court case number S147719, available on the California courts' website at www.courtinfo.ca.gov. See *Mir v. Little Company of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir.1988) (court may take judicial notice of court records).

of GBL, four kinds of steroids, syringes, a hairspray can with a false bottom and a hidden compartment, $34,500 in cash (mostly in $20 bills), and a money counter (R.T. 29–31, 36–48, 98–106). One box containing bottles of GBL assertedly was sealed and contained 32 unlabeled bottles of GBL packed in foam (R.T. 32, 36, 70). The other box allegedly had been opened and contained 22 unlabeled bottles of GBL with spaces for 10 missing bottles (R.T. 36, 69, 72). Ball also allegedly found financial documents associated with Petitioner's production company (R.T. 53–55, 78–80).

Petitioner reportedly told Ball that the steroids belonged to Petitioner (R.T. 58). According to Ball, Petitioner identified the substance in the bottles as "Renewtrient" or "Blue Nitro," or a similar substance (R.T. 58). Petitioner allegedly said: "It is like GHB. It feels like GHB after you eat it, but it is not" (R.T. 58). Petitioner allegedly told Ball that Petitioner did not know where he had obtained the GBL, and was not sure when he obtained it, but it possibly was a year before (R.T. 58). Petitioner reportedly said he had earned the money doing construction and putting on "raves" (R.T. 59). Ball said Petitioner could not produce any receipts to show this alleged income, but provided the name of his business manager, Valentin Martinez, and a business associate, Trece Romero, or "Ice Tea" (R.T. 59–62). Petitioner allegedly said he had started a production company at the beginning of 2002, but had not yet made any money (R.T. 60). Asked why he needed cash at hand, Petitioner reportedly responded: "I don't know" (R.T. 61). Petitioner allegedly identified a Ford truck parked outside as his, saying he paid $9000 for it (R.T. 61–63). According to Ball, Petitioner first said he bought the truck from a friend whom he could not identify, then said he bought it from Auto Trader (R.T. 63).

DEA forensic chemist Terry Caldwell testified that GBL was not a controlled substance under federal law, explaining that "controlled is a specific category of substances" (R.T. 111). Caldwell said GBL was a federally regulated "list 1 chemical" (R.T. 111). According to Caldwell, the GBL in Petitioner's apartment weighed a total of 3564 grams (R.T. 101).

Police officer and expert witness Troy Gielish testified that GBL converts to gamma hydroxybutyric acid ("GHB") in the body (R.T. 115). Gielish said that, although some people consume GBL "straight," more typically it is converted to GHB by mixing it with another chemical (R.T. 115). Gielish said GBL is regulated, and can be obtained for use as an industrial cleaning solvent by companies who go through a restrictive approval process (R.T. 116–17). According to Gielish, before regulation in 1999 and 2000, GBL was marketed to body builders by companies such as "Renewtrient" (R.T. 119).

According to Gielish, a typical dose of GBL is one half to three grams, having a street value of $5 to $20 (R.T. 123). Gielish said the bottles found in Petitioner's apartment were contained in the type of packaging used by someone "trying to elude law enforcement" because the packaging did not satisfy shipping regulations (R.T. 121). Gielish assertedly had never encountered a situation where a person had 3564 grams of GBL for personal use (R.T. 128–29). Gielish said he had never seen a case where a person who possessed GBL for personal consumption had broken it down into individual quantities; rather, a person possessing the substance for personal use usually stored it in one large container (R.T. 130). Gielish said that typically a person possessing GBL for sale would have a large amount of the product, and a large amount of currency, usually in smaller denominations from $5 to $20

(R.T. 129–30). Gielish said he had seen dealers store GBL in an item like the hairspray can found in Petitioner's apartment, so as to bring the concealed substance into clubs for sale (R.T. 131). Gielish opined that a person who possessed two boxes of unlabeled bottles of GBL, packed in foam, one of which was missing 10 bottles, and who possessed $34,500 in cash, much of it in $20 bills, and a money counter, and who did not show a means of income to justify the amount of cash, possessed the GBL for sale (R.T. 134–35).

On cross-examination, Gielish testified that GHB became a controlled substance in 2000 (R.T. 138). Gielish said that, at that time, GBL was an "analog" of GHB (R.T. 138–39). Asked whether he was aware that GBL was first listed as a controlled substance in 2002, Gielish said GBL became listed, but always had been considered an analogue because it metabolizes into GHB, and that as an analogue it was illegal (R.T. 141). Gielish said that in March of 2000 federal law banned GHB and its analogues (R.T. 143–44).

## II. *Defense Case*

Petitioner testified that he, Martinez and "Ice Tea" were partners in a production company that started up in January of 2002 (R.T. 184, 188). Petitioner allegedly looked for venues and artists for car show concerts, and Martinez and associates of Ice Tea allegedly were investors (R.T. 184–85, 188). Petitioner allegedly set up a bank account with a deposit of $60,000 obtained from the investors (R.T. 186–87). Petitioner said he was using cash to employ people and hire venues, because it was a "cash money business" (R.T. 189). Petitioner ran the company out of his house, and it had not yet made any money (R.T. 189–90).

Petitioner said he had been body building for over ten years, and used various substances to grow muscles (R.T. 191).

Petitioner said he engaged in "cycling," a workout program in which steroids where cycled or "stacked" (R.T. 191–92). At some point, Petitioner allegedly learned of GBL, which he was told was called "Renewtrient" and "Blue Nitrol" (R.T. 192). People in the gym allegedly told Petitioner that this substance would produce better sleep, growth hormones and hair (R.T. 192–93). Petitioner said a friend of his ordered the substance on the Internet (R.T. 193–94). Petitioner allegedly obtained two boxes, used approximately ten bottles from the first, and never opened the second (R.T. 194, 196). Petitioner allegedly poured the substance into a water bottle to consume it, and assertedly used approximately two or three bottles a week (R.T. 195).

Petitioner said he had no idea GBL was a controlled substance (R.T. 196). Petitioner said the money in the safe and the money counter were for a concert in Tucson for which Petitioner was preparing (R.T. 198–99). Petitioner admitted suffering a felony conviction in 1998 for battery causing serious bodily injury (R.T. 202).

On cross-examination, Petitioner admitted he was "not sure exactly" who the investors were, and admitted he had no contract with the investors (R.T. 204). Petitioner admitted that he deposited an additional $10,000 in the bank account after the initial deposit of $60,000, and said that the additional deposit reflected a personal loan from Ice Tea unrecorded in any writing (R.T. 207–08). Petitioner said the money in his apartment was withdrawn from the account for his business venture sometime in March, but admitted he did not tell Officer Ball about this withdrawal (R.T. 209–10). Petitioner said his associates withdrew approximately $35,000 from the account and gave it to Petitioner, although Petitioner did not know all the

details concerning the event or what he would owe to whom (R.T. 208–12, 217).

Petitioner said that, prior to January 1, 2002, he worked in construction (R.T. 218). Petitioner's production company allegedly did not pay Petitioner (R.T. 218). However, Petitioner assertedly used the production company's money to buy the truck, which he allegedly planned to use for company business (R.T. 218–19). Petitioner said that Martinez loaned Petitioner the Mercedes Petitioner was driving (R.T. 219–20). Petitioner admitted using production company funds to buy an entertainment center for $3000 cash (R.T. 220–21). Petitioner also admitted that on April 18, 2002, officers who stopped and searched Petitioner found he was carrying over $21,000 in cash (R.T. 222–23).

Petitioner admitted telling a police officer that GBL did the "same thing" as GHB (R.T. 229). Petitioner said he "maybe" remembered hearing talk in the gym about GHB, and that during those talks he spoke to individuals who used GHB or GBL for body building (R.T. 230–31).

Petitioner said he bought the GBL from a friend who told him how to use it (R.T. 233–34). Petitioner said he did not think it was strange that the substance came with no labels or instructions, and never wondered why it was unavailable on store shelves (R.T. 233–34). Petitioner allegedly "cycled" the GBL with the steroids (R.T. 236).

Petitioner said he did not know why he bought two boxes of GBL without knowing first how GBL would affect him (R.T. 236). Yet, Petitioner later said he bought two boxes because he had previously tried GBL in late 2001 and wanted to have some "leftover" without having to "chase the person around to find it" (R.T. 237–38). Petitioner testified he had possessed the

GBL only approximately four months, but admitted he told Ball that Petitioner had possessed the GBL for a year or more (R.T. 239).

## PETITIONER'S CONTENTIONS

Petitioner contends: [4]

1. California's criminalization of possession of GBL allegedly violates the Supremacy Clause and the Commerce Clause because GBL assertedly is not a controlled substance under Federal law (First Amended Petition ("FAP"), Grounds One and Two);

2. Petitioner's 2002 conviction for possession for sale of GBL allegedly violated Due Process because possession for sale of GBL allegedly was not a crime in 2001 when Petitioner assertedly purchased the GBL, and Petitioner allegedly had no notice that possession for sale of GBL would become unlawful in 2002 (FAP, Ground Eight);

3. The trial court allegedly improperly used Petitioner's battery conviction as a strike (FAP, Grounds Three, Five and Nine);

4. The imposition of an upper term sentence allegedly violated *Cunningham* (FAP, Ground Four);

5. The prosecutor allegedly knowingly presented false testimony and assertedly committed misconduct in closing argument (FAP, Ground Seven); and

6. Petitioner's counsel allegedly rendered ineffective assistance in a variety of ways, including by assertedly:

 a. Failing to "research laws on GBL," to argue that Petitioner lawfully purchased the GBL, and to object to the prosecutor's alleged misstatements of law concerning GBL;

---

**4.** The Court has reorganized Petitioner's claims for clarity.

b. Failing to present two expert witnesses;

c. Failing to object to alleged prosecutorial misconduct;

d. Allowing Petitioner to be impeached by the prior battery conviction;

e. Failing to research Petitioner's prior convictions, to object to the use of Petitioner's battery conviction as a strike, and to present mitigating evidence concerning the strike; and

f. Failing to object to the imposition of an upper term sentence (FAP, Ground Six).

## STANDARD OF REVIEW

A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (as amended); *see also Woodford v. Visciotti*, 537 U.S. 19, 24–26, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002); *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); *Williams v. Taylor*, 529 U.S. 362, 405–09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ "Clearly established Federal law" refers to the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if: (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts … materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *See Early v. Packer*, 537 U.S. at 8, 123 S.Ct. 362 (citation omitted); *Williams v. Taylor*, 529 U.S. at 405–06, 120 S.Ct. 1495.

Under the "unreasonable application prong" of section 2254(d) (1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. at 76, 123 S.Ct. 1166 (citation omitted); *see also Woodford v. Visciotti*, 537 U.S. at 24–26, 123 S.Ct. 357 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts).

A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. at 407, 120 S.Ct. 1495 (citation omitted).

■ "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.' " *Id.* at 520–21, 123 S.Ct. 2527 (citation omitted); *see also Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968, 124 S.Ct. 446, 157 L.Ed.2d 313 (2003).

In applying these standards, this Court looks to the last reasoned state court deci-

sion. *See Franklin v. Johnson*, 290 F.3d 1223, 1233 n. 3 (9th Cir.2002). Where no such reasoned opinion exists, as where a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000). If the state court declined to decide a federal constitutional claim on the merits, this Court must consider that claim under a *de novo* standard of review rather than the more deferential "independent review" of unexplained decisions on the merits authorized by *Delgado v. Lewis*. *See Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir.2004) (standard of *de novo* review applicable to claim state court did not reach on the merits).

## DISCUSSION

For the reasons discussed below, the First Amended Petition should be denied and dismissed on the merits with prejudice.[5]

### I. *Petitioner's Preemption Claim Lacks Merit.*

#### A. *Background*

California's version of the Uniform Controlled Substances Act, California Health and Safety Code section 11000 *et seq.*, is modeled on the federal Controlled Substances Act, 21 U.S.C. section 801 *et seq. See Williamson v. Bd. of Medical Quality Assurance*, 217 Cal.App.3d 1343, 1352, 266 Cal.Rptr. 520 (1990) (describing 1985 revision of California law to "parallel" the federal Controlled Substances Act). Like the federal Controlled Substances Act, California's Act categorizes various controlled substances according to five "Schedules." *See* Cal. Health & Safety

Code §§ 11054–11058; 21 U.S.C. § 812; *People v. Alexander*, 178 Cal.App.3d 1250, 1256–57, 224 Cal.Rptr. 290 (1986) (describing 1985 revision of California's Controlled Substances Act included schedules which "generally paralleled" those in the federal Controlled Substances Act). Under California law, possession for sale of a number of Schedule I and Schedule II controlled substances is unlawful. *See* Cal. Health & Safety Code § 11351.

Prior to January 1, 2002, California Health and Safety Code section 11055(e) designated GHB and GBL as regulated substances, the possession of which without a prescription was unlawful. *See* former Cal. Health & Safety Code § 11055(e); Cal. Health & Safety Code § 11351; Cal. Health & Safety Code § 11377(a) (possession of substances specified in Section 11055(e) unlawful without prescription). No Schedule II controlled substance could be dispensed except by specified health practitioners meeting the requirements of the Controlled Substances Act. Cal. Health & Safety Code §§ 1158(a), (b). Effective January 1, 2002, the California Legislature reclassified GHB and GBL as Schedule I controlled substances. *See* Cal. Stats.2001, ch. 841 (eff.Jan. 1, 2002).

Under federal law, possession with intent to distribute or dispense a controlled substance, unless otherwise authorized by the federal Controlled Substances Act, is unlawful. 21 U.S.C. § 841(a) (1). Pursuant to the "Hillory J. Farias and Samantha Reid Date–Rape Drug Prohibition Act of 2000," Pub.L. 106–172, 114 Stat. 7 (Feb. 18, 2000), GHB became a federal Schedule I controlled substance. *See* 21 U.S.C. § 841(b)(1)(C); 21 C.F.R. § 1308.11(e)(1); *United States v. Geborde*, 278 F.3d 926, 932 (9th Cir.2002). Possession of GHB with the intent to distribute or dispense is

---

5. The Court has read, considered and rejected on the merits all of Petitioner's contentions.

The Court discusses Petitioner's principal contentions herein.

punishable by a term of not more than 20 years, and if death or bodily injury results, by a term of 20 years to life. 21 U.S.C. § 841(b)(1)(C). GBL is not specifically designated a federal controlled substance, but it is a "List I" chemical, *i.e.*, a chemical used in the manufacture of a controlled substance. 21 U.S.C. §§ 802(34)(X). The distribution of a "List I" chemical without compliance with required registration is unlawful. 21 U.S.C. § 843(a)(9). Possession or distribution of a listed chemical with knowledge or reasonable cause to believe that the listed chemical will be used to manufacture a controlled substance, except as authorized by federal law, also is unlawful. 21 U.S.C. § 841(c)(2).

The federal Controlled Substances Act treats a "controlled substance analogue," to the extent it is intended for human consumption, as a Schedule I controlled substance. 21 U.S.C. § 813. Therefore, possession for distribution of a controlled substance analogue of a Schedule I controlled substance is unlawful. *See* 21 U.S.C. § 841(a)(1). A "controlled substance analogue" is a substance: "(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (iii) with respect to a person, which such person represents or intends to have a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II." 21 U.S.C. § 802(32)(A). In the "Hillory J. Farias and Samantha Reid Date–Rape Drug Prohibition Act of 2000," Congress expressly provided that the designation of GBL as a listed chemical "does not preclude a finding ... that [GBL] is a controlled substance analogue." 21 U.S.C. § 802(32)(b).

## B. *Discussion*

■ Petitioner contends possession for sale of GBL assertedly was not unlawful under federal law at the time of Petitioner's offenses, and that federal law assertedly preempted California's criminalization of possession of GBL for sale (FAP, Ground One). Petitioner also contends that the Court of Appeal misinterpreted state and federal law in rejecting Petitioner's preemption argument (FAP, Ground Two). For the reasons set forth below, Petitioner is not entitled to habeas relief on these contentions.

■ Federal law may preempt state law under the Supremacy Clause of the United States Constitution in one of three ways: (1) preemption by statute; (2) preemption by occupation of the field; or (3) preemption by conflict between state and federal regulation. *United States v. 4,432 Mastercases of Cigarettes, More or Less,* 448 F.3d 1168, 1189 (9th Cir.2006). The "ultimate touchstone" is the purpose of Congress. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citations and internal quotations omitted).

The federal Controlled Substances Act expressly provides:

No provision of [the Act] shall be construed as indicating an intent on the part of Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision ... and that State law so that the two cannot consistently stand together.

21 U.S.C. § 903. Thus, Congress expressly provided that the federal Controlled Substances Act did not preempt all state regulation of controlled substances. *See People of the Territory of Guam v. Villacrusis*, 992 F.2d 886, 887 (9th Cir.1993) (noting one purpose of the federal Controlled Substances Act was to "strengthen existing law enforcement authority," and that Congress "intended that federal efforts are to be in addition to, not in place of, local law enforcement efforts.") (citation omitted); *State v. Allard*, 313 A.2d 439, 444 (Me.1973) (21 U.S.C. section 903 shows Congress' "express reservation of state control over relevant aspects of the drug abuse field unless there is a positive conflict between state and federal statutes"; "Congress evidently intended that both federal and state governments should regulate the drug traffic which has become so prevalent."). Therefore, the issue here is whether the California statute criminalizing possession for sale of GBL creates a "positive conflict" such that the federal and state statutes cannot "stand together." The California Court of Appeal found no such conflict, noting that under federal law GBL was a controlled substance analogue of GHB, the possession of which was unlawful. *People v. Boultinghouse*, 134 Cal. App.4th at 623–24, 36 Cal.Rptr.3d 244.

■ The Court of Appeal's determination was not objectively unreasonable. Conflict preemption occurs when compliance with both state and federal law is impossible, or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Shroyer v. New Cingular Wireless Services, Inc.*, 498 F.3d 976, 988 (9th Cir.2007) (citations and internal quotations omitted). Mere tension between the federal and state law is insufficient. *Id.* Conflict preemption occurs only in "those situations where conflicts necessarily arise." *Id.* (citations and internal quotations omitted). The Court must pre-

sume "that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough County v. Automated Medical Laboratories*, 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *see also Law v. General Motors Corp.*, 114 F.3d 908, 910 (9th Cir.1997) (court must "entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects—like health and safety—'traditionally governed' by the states") (citation omitted). "Ordinarily, state causes of action are not preempted solely because they impose liability over and above that authorized by federal law ...." *California v. ARC America Corp.*, 490 U.S. 93, 105, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (citations omitted).

Petitioner's apparent contention that federal law permits a person to possess GBL for sale free of regulation or possible criminal penalty is simply erroneous. As indicated above, possession without registration of GBL as a "List I" chemical has been unlawful since 2000. 21 U.S.C. § 843(a)(9). Additionally, GBL qualifies as a controlled substance analogue of GHB, the possession for distribution of which is unlawful. Congress has recognized as much. In the "Hillory J. Farias and Samantha Reid Date–Rape Drug Prohibition Act of 2000," Congress included a finding that "[i]f taken for human consumption, common industrial chemicals such as gamma butyrolactone and 1.4–butanediol are swiftly converted by the body into GHB," and that "[i]llicit use of these *and other GHB analogues and precursor chemicals* is a significant and growing law enforcement problem." *See* Congressional Findings and Purposes Regarding Gamma Hydroxybutyric Acid, reprinted following 21 U.S.C. § 812; Hillory J. Farias and Samantha Reid Date–Rape Drug Prohibition Act of 2000, Pub.L. 106–172, § 2(4) (emphasis added). As indicated above,

Congress also expressly provided that the listing of GBL as a List I chemical would not preclude its designation as a GHB analogue. *See* 21 U.S.C. § 802(32)(B). In promulgating regulations designating GBL as a List I chemical, the Drug Enforcement Administration ("DEA") echoed Congress's finding that, if consumed, GBL is "swiftly converted into GHB by the body." *See* Placement of Gamma–Butyrolactone in List I of the Controlled Substances Act, 65 Fed.Reg. 21645 (April 24, 2000). The DEA also stated that GBL is "structurally and pharmacologically similar to GHB .... " *Id.* Federal courts have found GBL to be a GHB analogue under federal law. *See United States v. Turcotte*, 405 F.3d 515, 529 (7th Cir.2005), *cert. denied*, 546 U.S. 1089, 126 S.Ct. 1022, 163 L.Ed.2d 853 (2006) ("unlike many other potential controlled substances, Congress has specifically identified GBL as an analogue of GHB"; findings of Congress and DEA "are sufficient to put any drug merchant on notice that GBL qualifies as a controlled substance analogue"; footnote omitted); *United States v. Ansaldi*, 372 F.3d 118, 123 (2d Cir.), *cert. denied*, 543 U.S. 949, 125 S.Ct. 364, 160 L.Ed.2d 266 (2004) and 543 U.S. 960, 125 S.Ct. 430, 160 L.Ed.2d 324 (2004) ("GBL is one of the substances that the statute actually identifies as a potential controlled substance analogue."); *United States v. Fisher*, 289 F.3d 1329, 1336 (11th Cir.2002), *cert. denied*, 537 U.S. 1112, 123 S.Ct. 903, 154 L.Ed.2d 786 (2003) ("statements found in Public Law 106–172 and the DEA's Final Rules indicate that both Congress and the DEA considered GBL to be an analogue of GHB").

In sum, both federal and California law criminalize the possession for sale of GBL, albeit in slightly different ways. While California does so expressly, federal law achieves a comparable goal by criminalizing possession of GBL without registration, criminalizing possession of GBL as a controlled substance analogue, and

criminalizing possession of GBL with knowledge or reasonable cause to believe it will be used to make GHB. In these circumstances, Petitioner has failed to demonstrate the existence of any "positive conflict" such that federal and state law "cannot consistently stand together."

Petitioner's reliance on *Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (*"Raich"*) is unavailing. *Raich* held that Congress did not exceed its power under the Commerce Clause by enacting provisions of the federal Controlled Substances Act criminalizing the intrastate possession, manufacture or distribution of marijuana, and that under the Supremacy Clause the federal statute superseded California's Compassionate Use Act authorizing the limited possession and cultivation of marijuana for medicinal purposes. *Id.* at 17–33. *Raich*, a Commerce Clause case, did not involve the issue of whether the federal Controlled Substances Act preempted a state statute criminalizing possession for sale of a controlled substance not expressly designated a Schedule I controlled substance under federal law. The federal Controlled Substances Act may be a valid exercise of Congress' Commerce Clause power, and may displace state statutes that purport to make lawful that which federal law makes unlawful. However, as indicated above, the federal Controlled Substances Act does not occupy the field of regulation of drug trafficking to the exclusion of state regulation causing no "positive conflict." *See* 21 U.S.C. § 903. As discussed above, Petitioner has shown no "positive conflict" here.

Petitioner also apparently contends the Court of Appeal misinterpreted federal law by stating that Congress prohibited the "consumption" of GBL, and argues that the Court should apply the rule of lenity to California Health and Safety Code section 11054(e) (3) (making GBL a Schedule I

controlled substance) (FAP, Attached Memorandum ["FAP Mem."], Ground Two, pp. 1–2).[6] The Court of Appeal's statement that Congress has criminalized the "consumption" of GBL may have been inapt. However, for the reasons discussed above, the Court of Appeal correctly determined that the federal Controlled Substances Act did not preempt California law making possession for sale of GBL unlawful. Additionally, California Health and Safety Code section 11054(e) (3) contains no ambiguity concerning the designation of GBL as a Schedule I controlled substance; hence, the rule of lenity is inapplicable. *See United States v. Clark,* 435 F.3d 1100, 1107–08 (9th Cir.2006), *cert. denied,* 549 U.S. 1343, 127 S.Ct. 2029, 167 L.Ed.2d 772 (2007) (rule of lenity inapplicable where statute unambiguous).

Petitioner also appears to contend the Court of Appeal mischaracterized the record because a federal DEA lab test assertedly indicated the substance Petitioner possessed was not a controlled substance (FAP Mem., Ground One, p. 2). The record of the lab test to which Petitioner refers indicates that DEA analyst Terry Caldwell recorded that the GBL was a "non controlled substance" (FAP Mem., Ground One, p. 2; Exhibit to Petitioner's "Addendum to Notice of Lodging, etc."). At trial, Caldwell explained that he made this entry based on the federal list of controlled substances, that GBL was not a controlled substance under *federal* law, and that "controlled" was "a specific category of substances" (R.T. 107, 110–11). Caldwell never denied that GBL was a

controlled substance under state law, and never denied that federal law regulated GBL. Indeed, Caldwell testified GBL was a "regulated" chemical under federal law (R.T. 107–09).

In sum, the Court of Appeal's rejection of Petitioner's preemption claim was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on Grounds One or Two of the First Amended Petition.

## II. *Petitioner's Claim that He Lacked Notice that Possession for Sale of GBL Was Unlawful Does Not Merit Habeas Relief.*

■ Petitioner contends that, at the time of the offense in March of 2002, he lacked notice that possession for sale of GBL was unlawful (FAP, Ground Eight). According to Petitioner, he legally purchased the GBL in 2001 as the dietary supplement "Renutrient," prior to the change in California law making GBL a controlled substance, and did not know the law had changed (FAP Mem., Ground Eight, pp. 2–3).[7]

■■ This claim lacks merit. "It is not unconstitutional for Congress or a state legislature to forbid possession of a previously licit good...." *United States v. Patton,* 451 F.3d 615, 636 (10th Cir.2006), *cert. denied,* 549 U.S. 1213, 127 S.Ct. 1247, 167 L.Ed.2d 87 (2007) (citation omitted). To provide constitutionally adequate notice of

---

**6.** The Memorandum attached to the form First Amended Petition is not consecutively paginated. Rather, Petitioner consecutively paged each of the arguments supporting each separate ground for relief. Hence, the Court refers to the pages in the First Amended Petition by both Ground number and page number.

**7.** Petitioner's assertion that he did not know GBL was contained in the bottles he assertedly bought as "Renutrient" is seriously undermined by his trial testimony admitting that Petitioner told police that the substance did the "same thing as GHB" (R.T. 229), and by Officer Ball's testimony that Petitioner told the officer the substance "feels like GHB after you eat it, but it is not" (R.T. 58).

a change in the law, "a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." *Texaco, Inc. v. Short*, 454 U.S. 516, 532, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982); *United States v. Hancock*, 231 F.3d 557, 564 (9th Cir.2000), *cert. denied*, 532 U.S. 989, 121 S.Ct. 1641, 149 L.Ed.2d 500 (2001). Petitioner had a reasonable opportunity to comply with the provisions of the new California law regarding GBL between January, 2002 and March, 2002.

In any event, Petitioner had earlier and further notice that his possession of GBL was unlawful. In 2001, when Petitioner allegedly purchased the GBL, GBL was a Schedule II controlled substance in California, the possession of which without a prescription was unlawful. *See* former Cal. Health & Safety Code § 11055(e)(6);[8] Cal. Health & Safety Code § 11377(a). Moreover, since 1988 California has treated controlled substance analogues "the same" as the controlled substances of which they are analogues. *See* Cal. Health & Safety Code §§ 11400, 11401(a); *People v. Silver*, 230 Cal.App.3d 389, 394–95, 281 Cal.Rptr. 354 (1991) (upholding conviction for possession of controlled substance analogue of methamphetamine; noting that California law defines a controlled substance analogue in the "same terms" as federal law, and that "it should come as no surprise" that a state statute employing the same language as the federal statute "also covered the same drug"). Thus, Petitioner was on notice that California could treat GBL as a controlled substance analogue of GHB.

In the Reply, Petitioner attempts to recast his claim as a claim for violation of the Ex Post Facto Clause (*see* Reply, p. 7). The Ex Post Facto Clause prohibits retroactive punishment for acts which could not be punished at the time they were committed. *Collins v. Youngblood*, 497 U.S. 37, 41–46, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *Rise v. State of Oregon*, 59 F.3d 1556, 1562 (9th Cir.1995), *cert. denied*, 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996). Possession of GBL for sale was a crime in California at the time Petitioner committed the offense.[9]

For the foregoing reasons, the state courts' rejection of this claim was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on Ground Eight of the First Amended Petition.

### III. *Petitioner's Challenge to the Use of His Prior Battery Conviction as a Strike Does Not Merit Habeas Relief.*

To qualify as a "strike" under the Three Strikes Law, a prior conviction must be either a "serious" or a "violent" felony. *See* Cal.Penal Code §§ 667(d)(1), 1170.12(b)(1). The Three Strikes Law defines a "serious felony" as any offense so defined in California Penal Code section 1192.7(c). *See* Cal.Penal Code §§ 667(d)(1); 1170.12(b)(1). At the time of

---

**8.** In 1999, the California Legislature amended California Health and Safety Code section 11055(e)(6) to include as a Schedule II controlled substance not only GHB but also "its immediate precursors, isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, including, but not limited to, gamma-butyrolactone." *See* 1999 Cal. Stats. c. 975 (filed

with the Secretary of State on October 10, 1999).

**9.** Contrary to Petitioner's apparent argument, Petitioner was not punished for having purchased GBL in 2001. He was punished for possessing GBL for sale in March of 2002.

Petitioner's sentencing, California Penal Code section 1192.7(c)(8) defined a "serious felony" to include, in relevant part, any felony "in which the defendant personally inflicts great bodily injury on any person, other than an accomplice . . . ."

In Grounds Three, Five and Nine, Petitioner contends his 1998 conviction for battery with serious bodily injury did not qualify as a strike because the evidence assertedly was insufficient to show Petitioner personally inflicted great bodily injury within the meaning of section 1192.7(c)(8). The Court of Appeal rejected this assertion, ruling that the jury in the 1998 case found Petitioner guilty both of assault by means likely to produce great bodily injury and battery with serious bodily injury, and found true the allegation that, with respect to the assault, Petitioner personally inflicted great bodily injury on the victim (*see* Respondent's Lodgment 6, pp. 9–10). The Court of Appeal also found that, in this prior case, both counts arose from a single incident in which Petitioner struck the victim in the face (Respondent's Lodgment 6, p. 10). This finding supports the conclusion that Petitioner personally inflicted great bodily injury during both the assault and the battery, thus rendering the battery conviction a serious felony and a strike. *Id.*

■ Matters relating to sentencing and serving of a sentence generally are governed by state law and do not raise a federal constitutional question. *See Miller v. Vasquez,* 868 F.2d 1116, 1118–19 (9th Cir.1989) (holding that question of whether particular prior conviction qualifies for sentence enhancement under California law is not cognizable on federal habeas corpus); *see also Middleton v. Cupp,* 768 F.2d 1083, 1085 (9th Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986) (federal habeas relief "unavailable for alleged error in the interpretation or application of state law");

*Sturm v. California Adult Authority,* 395 F.2d 446, 448 (9th Cir.1967), *cert. denied,* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 466 (1969) ("a state court's interpretation of its [sentencing] statute does not raise a federal question").

■ Under narrow circumstances, however, the misapplication of state sentencing law may violate due process. *See Richmond v. Lewis,* 506 U.S. 40, 50, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992). However, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." *Christian v. Rhode,* 41 F.3d 461, 469 (9th Cir.1994). "[T]he failure of a state to abide by its own statutory commands [regarding sentencing] may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state." *Fetterly v. Paskett,* 997 F.2d 1295, 1300 (9th Cir.1993), *cert. denied,* 513 U.S. 914, 115 S.Ct. 290, 130 L.Ed.2d 205 (1994); *see also Walker v. Deeds,* 50 F.3d 670, 672–73 (9th Cir.1995) (state sentencing court violated due process by failing to make habitual offender determination required by state law).

California law provides that a court may refer to the "entire record of conviction" in order to determine whether a prior conviction qualifies as a "strike" under the Three Strikes Law. *See People v. Guerrero,* 44 Cal.3d 343, 356, 243 Cal.Rptr. 688, 696, 748 P.2d 1150 (1988). At the trial of the priors, the prosecution submitted a certified copy of the 1998 conviction, a booking photograph, and Petitioner's fingerprints (R.T. 346–49). Petitioner does not deny that the record of conviction showed that the jury in the 1998 case found Petitioner guilty both of assault by means likely to produce great bodily injury and battery with serious bodily injury, and also found true the allegation that, with respect to the assault,

Petitioner personally inflicted great bodily injury on the victim (see Pet. Mem., Ground Five, p. 1; see also R.T. 349, 361–62). Rather, Petitioner appears to contend that, because the record of conviction allegedly did not show that the jury in the 1998 case made a finding that Petitioner had inflicted great bodily injury in connection with the battery (as distinguished from the assault), the court could not use the battery conviction as a strike. This contention fails.

Petitioner does not dispute that the 1998 convictions arose out of a single incident committed against one victim. Indeed, not only was there no dispute at trial or at sentencing that the 1998 convictions arose out of a single incident against one victim, but Petitioner's counsel obtained favorable rulings for Petitioner based on this fact. Before trial, Petitioner's counsel filed a "Disposition Brief" contending, inter alia, that the court should strike one of the 1998 convictions because those convictions arose from a single incident involving one victim (see C.T. 30–78). Petitioner's counsel attached to that document a copy of a minute order showing that the court suspended imposition of sentence and imposed probation (C.T.60–61). One of the conditions of probation was that Petitioner not "contact, annoy, or molest Christopher Sickels," the victim (C.T.63).

At the close of the prosecution's case, Petitioner's counsel argued that the court should not allow the prosecution to impeach Petitioner with both of the 1998 prior convictions because they arose out of one incident (R.T. 177–78). The court agreed, and said it would permit impeachment with only one of the two 1998 priors (R.T. 178–79). Before sentencing, Petitioner's counsel filed a motion requesting the court to strike one of the 1998 convictions on the ground that the two convictions were the result of a single act (C.T. 170–72). The trial court agreed and struck the assault conviction, to Petitioner's substantial benefit (R.T. 367).[10] Under such circumstances, the Court of Appeal reasonably concluded that Petitioner inflicted great bodily injury on the victim of the 1998 offense in connection with the battery as well as the assault, and hence Petitioner's battery conviction qualified as a strike.

Petitioner's reliance on Shepard v. United States, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) ("Shepard"), is unavailing. Shepard held that, for purposes of the federal Armed Career Criminal Act, 18 U.S.C. section 924(e), a court determining whether a prior burglary conviction upon a plea of guilty constituted a predicate offense could look to the charging document, the plea agreement or plea transcript, to "some comparable judicial record of this information," and to any fact found by the judge to which the defendant assented, but could not consider a police report. Shepard, 544 U.S. at 13, 16, 125 S.Ct. 1254. This Court assumes, arguendo, Shepard established a constitutional standard governing the sort of evidence a state court could consider in determining whether a prior conviction supported a stiffer sentence under state law. But see Hobbs v. McKune, 2006 WL 3246772, at *4 (D.Kan. Nov.8, 2006) (Shepard "does not state a principle of constitutional law"); People v. McGee, 38 Cal.4th 682, 708, 42 Cal.Rptr.3d 899, 133 P.3d 1054 (2006), cert. denied, 549 U.S. 1168, 127 S.Ct. 1123, 166 L.Ed.2d 895 (2007) (Shepard did not announce any constitutional rule; rather, the issue presented in Shepard "was resolved

10. Because the court struck one of the 1998 convictions, Petitioner no longer was eligible to receive a Three Strikes sentence of 25 years to life, but rather was only subject to the "One Strike" provision of the Three Strikes Law providing for a doubling of the term. See Cal.Penal Code § 667(e)(1), § 1170.12(c)(1).

as a matter of statutory interpretation"). Even so, Petitioner has not shown that the trial court in his case considered any item of evidence disapproved by *Shepard. See Shepard,* 544 U.S. at 16, 125 S.Ct. 1254 (court may consider, *inter alia,* a factual finding to which the defendant assented).[11]

■ Petitioner's battery conviction qualified as a strike. In California the term "serious bodily injury" contained in California Penal Code section 243(d) "is essentially equivalent to or synonymous with 'great bodily injury' for the purpose of a 'serious felony' sentence enhancement pursuant to Penal Code sections 667, subdivisions (a) and (d), and 1192.7, subdivision (c) (8)." *People v. Moore,* 10 Cal. App.4th 1868, 1871, 13 Cal.Rptr.2d 713 (1992). Therefore, Petitioner's offense of battery with serious bodily injury fell "under the statute's general category of 'any other felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice ....' " *Id.* (noting that defendant was the only person charged in the battery case and was the sole perpetrator of the crime).[12] Hence, the state courts did not err in determining that Petitioner's prior conviction qualified as a strike.

For the foregoing reasons, the state courts' rejection of Petitioner's claims relating to the use of the battery conviction as a strike was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on Grounds Three, Five or Nine of the First Amended Petition.

## IV. *Petitioner's Cunningham Claim Does Not Merit Habeas Relief.*

■ In *Apprendi,* the United States Supreme Court held that, regardless of its label as a "sentencing factor," any fact *other than the fact of a prior conviction* that increases the penalty for a crime beyond the prescribed statutory maximum among other things must be "submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added). In *Blakely v. Washington,* the Supreme Court held that the "statutory maximum" for *Apprendi* purposes "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant ....*" *Blakely,* 542 U.S. at 303, 124 S.Ct. 2531 (original emphasis). In *Cunningham,* the Supreme Court held that a California judge's imposition of an upper term sentence based on certain facts found by the judge rather than the jury violated the Constitution.

---

11. To the extent Petitioner contends the court used the battery conviction as a strike "simply because" Petitioner's counsel allegedly "wrongly" conceded the battery was a strike (*see* FAP Mem., Ground Three, p. 1), Petitioner's claim fails. The court did not deem the battery conviction to be a strike based upon any incorrect concession by defense counsel. Moreover, for the reasons discussed herein, counsel's conclusion that the battery conviction qualified as a strike was correct.

12. *People v. Hawkins,* 108 Cal.App.4th 527, 133 Cal.Rptr.2d 548 (2003), cited by Petitioner, concerned only the issue of whether battery with serious bodily injury constituted a *violent* felony (not a *serious* felony) within the meaning of California Penal Code section 667.5(c)(8). Also inapposite is *People v. Fountain,* 82 Cal.App.4th 61, 97 Cal.Rptr.2d 824 (2000), which held that a juvenile adjudication for battery with serious bodily injury did not qualify as a strike, where a second count to which a great bodily injury enhancement was attached was dismissed and the record was silent as to whether defendant acted by means of force "likely" to cause great bodily injury. Here, the jury in the 1998 case expressly found true the allegation that Petitioner assaulted the victim by means of force likely to cause great bodily injury.

*Cunningham,* 127 S.Ct. at 871, 127 S.Ct. 856.

At sentencing, the court imposed the upper term based on the facts that Petitioner had suffered three felony convictions since 1996 and that those convictions were of "increasing seriousness" (R.T. 368). The law is clear that the imposition of an upper term sentence based on prior convictions does not violate *Blakely.* By endorsing a "prior conviction exception" to its requirement that a jury find true the facts used to increase a sentence beyond the statutory maximum, the *Apprendi* Court cited its earlier decision in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (*"Almendarez–Torres"*). *Apprendi,* 530 U.S. at 487–90, 120 S.Ct. 2348. In *Almendarez–Torres,* the Court ruled that an indictment was not defective for failure to charge the fact of a prior conviction used as a sentence enhancement, on the ground that the prior conviction was not an element of the offense. *Almendarez–Torres,* 523 U.S. at 238–47, 118 S.Ct. 1219. Both *Cunningham* and *Blakely* reaffirm the exception *Apprendi* preserves for "the fact of a prior conviction." *See Cunningham,* 127 S.Ct. at 869, 127 S.Ct. 856; *Blakely,* 542 U.S. at 301, 124 S.Ct. 2531.[13]

Therefore, to the extent the sentencing court based Petitioner's upper term sentence on his prior convictions, Petitioner's challenge to his sentence fails. *See United States v. Martin,* 278 F.3d 988, 1006 (9th Cir.2002) (*"Apprendi* expressly excludes recidivism from its scope. Defendant's criminal history need not be proved to a jury beyond a reasonable doubt. [citations]."); *see also United States v. Harris,* 447 F.3d 1300, 1303 (10th Cir.2006) (in determining whether to impose increased sentence pursuant to 18 U.S.C. section 924(e), "the requisite number of convictions is a question for the court"); *United States v. Bradshaw,* 281 F.3d 278, 294 (1st Cir.), *cert. denied,* 537 U.S. 1049, 123 S.Ct. 660, 154 L.Ed.2d 524 (2002) (argument that *Apprendi* barred court from imposing sentence under federal Three Strikes law based on prior convictions was a "non-starter"); *Dahler v. United States,* 259 F.3d 763, 765 (7th Cir.2001) (under *Apprendi* and *Almendarez–Torres,* "maximum sentences may be enhanced on account of prior convictions without submitting to the jury any questions about the number or significance of those convictions").

The sentencing court based its choice of the upper term on the "increasing seriousness" as well as the fact of Petitioner's prior convictions. The United States Supreme Court has not yet defined the precise scope of the prior conviction excep-

---

13. Petitioner appears to suggest that *Almendarez–Torres* is no longer good law (FAP Mem., Ground Three, pp. 3–4). In a concurring opinion in *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), Justice Thomas suggested that *Almendarez–Torres* had been "eroded by this Court's subsequent jurisprudence," and that a majority of the Justices had indicated that *Almendarez–Torres* was decided wrongly. *Id.* at 27, 125 S.Ct. 1254 (Thomas, J., concurring). However, this Court is bound to follow *Almendarez–Torres* as controlling precedent unless and until the Supreme Court overrules that case. *United States v. Weiland,* 420 F.3d 1062, 1079–80 n. 16 (9th Cir.2005), *cert. de-* *nied,* 547 U.S. 1114, 126 S.Ct. 1911, 164 L.Ed.2d 667 (2006) (Ninth Circuit "bound to follow" *Almendarez–Torres* "until it is explicitly overruled by [the Supreme Court]"); *United States v. Pacheco–Zepeda,* 234 F.3d 411, 414 (9th Cir.2000), *cert. denied,* 532 U.S. 966, 121 S.Ct. 1503, 149 L.Ed.2d 388 (2001) ("[u]nless and until *Almendarez–Torres* is overruled by the Supreme Court, we must follow it.") (citations omitted). Furthermore, the Supreme Court recently reaffirmed the vitality of the *Almendarez–Torres* prior conviction exception. *See James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 1600 n. 8, 167 L.Ed.2d 532 (2007).

tion.[14] A number of courts have held that the exception encompasses "subsidiary findings" concerning a prior conviction. *See United States v. Santiago*, 268 F.3d 151, 156–57 (2d Cir.2001), *cert. denied*, 535 U.S. 1070, 122 S.Ct. 1946, 152 L.Ed.2d 849 (2002) ("The determination of 'the fact of a prior conviction' implicitly entails many subsidiary findings ..."; judge may determine the " 'who, what, when, and where' of a prior conviction"); *see also United States v. Grisel*, 488 F.3d 844, 847 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 128 S.Ct. 425, 169 L.Ed.2d 298 (2007) (date of offense within exception); *United States v. Corchado*, 427 F.3d 815, 820 (10th Cir. 2005), *cert. denied*, 547 U.S. 1086, 126 S.Ct. 1811, 164 L.Ed.2d 546 (2006) (exception applies to "subsidiary findings such as whether a defendant was under court supervision when he or she committed a subsequent crime"); *United States v. Brown*, 417 F.3d 1077, 1079–80 (9th Cir. 2005) (whether offense is a "crime of violence" for purposes of federal career-offender enhancement is a legal, not a factual question, and hence falls within prior conviction exception); *United States v. Kempis–Bonola*, 287 F.3d 699, 703 (8th Cir.), *cert. denied*, 537 U.S. 914, 123 S.Ct. 295, 154 L.Ed.2d 196 (2002) (exception applies to "sentencing-related circumstances of recidivism"). However, in *United States v. Kortgaard*, 425 F.3d 602, 606–10 (9th Cir.2005), the Ninth Circuit held that a district court's upward departure based on the judge's finding that the applicable federal sentencing guidelines range inadequately represented the seriousness of the defendant's criminal history and his likelihood of recidivism did not fall within the prior conviction exception. The *Kortgaard* Court reasoned that the issue was not the quantity of the defendant's criminal history, but its quality.

In the present case, however, this Court need not determine whether the finding that Petitioner's prior convictions were of "increasing seriousness" required a jury determination. In *People v. Black*, 41 Cal.4th 799, 62 Cal.Rptr.3d 569, 161 P.3d 1130 (2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 1063, 169 L.Ed.2d 813 (2008), the California Supreme Court held, as a matter of state law, that "the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term." *Id.* at 813, 62 Cal. Rptr.3d 569, 161 P.3d 1130 (citing *People v. Osband*, 13 Cal.4th 622, 728, 55 Cal. Rptr.2d 26, 919 P.2d 640 (1996), *cert. denied*, 519 U.S. 1061, 117 S.Ct. 696, 136 L.Ed.2d 618 (1997)). "Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum.' " *People v. Black*, 41 Cal.4th at 813, 62 Cal.Rptr.3d 569, 161 P.3d 1130.

Here, the mere fact of Petitioner's prior convictions constituted an aggravating circumstance warranting imposition of an upper term sentence without a jury finding. *See People v. Black*, 41 Cal.4th at 818, 62 Cal.Rptr.3d 569, 161 P.3d 1130; Cal.Penal Code § 1170(b); Cal. Ct. R. 4.421. Accordingly, the mere fact of those prior convictions rendered the upper term the "statutory maximum." *See Flores v. Hick-*

---

**14.** In *Shepard v. United States, supra*, the Supreme Court indicated that not every fact "about" a prior conviction fell within the prior conviction exception, indicating, *inter alia*, that a disputed fact about whether the defendant had committed a burglary constituting a violent felony within the meaning of 18 U.S.C. section 924(e) was "too far removed from the conclusive significance of a prior judicial record" to fall within the prior conviction exception. *Shepard*, 544 U.S. at 25, 125 S.Ct. 1254. However, the Court did not purport to define the precise reach of the prior conviction exception.

*man,* 533 F.Supp.2d 1068, 1081–82 (C.D.Cal.2008) (fact that petitioner was on parole or probation at the time of the offense fell within prior conviction exception and was "sufficient to expose petitioner to sentencing within the upper term"); *Jordan v. Evans,* 2007 WL 2703118, at *22 (S.D.Cal. Sept.14, 2007) ("Petitioner's prior convictions alone exposed him to the upper term of the sentencing range .... Although the trial judge also found several other aggravating factors, Petitioner's ... prior felony conviction was sufficient to expose him to the upper term. [citation]."). Because Petitioner's sentence did not exceed the statutory maximum, Petitioner's sentence did not violate *Cunningham,* regardless of whether the sentencing court also may have based the sentence on a factor or factors other than Petitioner's criminal history.

For the foregoing reasons, the state courts' rejection of Petitioner's *Cunningham* claim was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. Petitioner is not entitled to habeas relief on Ground Four of the First Amended Petition.

## V. *Petitioner's Claims of Prosecutorial Misconduct Do Not Merit Habeas Relief.*

Petitioner contends the prosecutor elicited the allegedly perjured testimony of Agent Gielish that it was unlawful to possess GBL prior to January 1, 2002 (FAP, Ground Seven, p. 1). Petitioner also contends the prosecutor used the allegedly perjured testimony in closing argument (FAP, Ground Seven, pp. 2–3). The Court of Appeal ruled that Gielish's testimony was "clearly based on his understanding of federal law" and was not false or misleading, and that the prosecutor made clear that, as of March 21, 2002, possession of GBL for sale was illegal under both state

and federal law (*see* Respondent's Lodgment 6, p. 8).

The prosecution's knowing use of perjured testimony to obtain a conviction can violate Due Process. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *see also United States v. Sherlock,* 962 F.2d 1349, 1364 (9th Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). However, "the fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false." *United States v. Croft,* 124 F.3d 1109, 1119 (9th Cir.1997). The question whether witnesses lied or erred in their perceptions or judgments is properly left to the jury. *See United States v. Zuno–Arce,* 44 F.3d 1420, 1422–23 (9th Cir.), *cert. denied,* 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *see also United States v. Scheffer,* 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ("A fundamental premise of our criminal trial system is that 'the *jury* is the lie detector.' ") (original emphasis; quoting *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974)).

To the extent Petitioner contends Gielish falsely testified that possession of GBL was unlawful prior to January 1, 2002, Petitioner's contention plainly lacks merit. As discussed above in connection with Petitioner's preemption claim, Gielish's testimony that GBL was an analogue of GHB under both federal and state law was accurate. Petitioner also contends Gielish lied when he testified that one could not order GBL through the Internet because "worldwide it is known that GHB and GBL are illegal," and that GBL could only be purchased by going through "proper regulations" (*see* R.T. 117). Petitioner has not shown that these statements were false.

Petitioner further contends that Gielish lied in response to defense counsel's question whether the first time GBL became listed as a controlled substance was January 1, 2002. Gielish responded that he was "not sure" (R.T. 142).[15] Petitioner has failed to demonstrate that this response was false.

■■■ Petitioner's claim that the prosecutor committed misconduct in closing argument also fails. Prosecutorial misconduct merits habeas relief only where the misconduct " 'so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process.' " *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citation omitted); *Bonin v. Calderon*, 59 F.3d 815, 843 (9th Cir.1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996) ("To constitute a due process violation, the prosecutorial misconduct must be so severe as to result in the denial of [the petitioner's] right to a fair trial."). In fashioning closing arguments, prosecutors are allowed reasonably wide latitude. *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir.1995). "The arguments of counsel are generally accorded less weight by the jury than the court's instructions and must be judged in the context of the entire argument and the instructions. [citation]." *Ortiz–Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir.1996).

■■■ The prosecutor's statement that the officers testified GBL was "regulated" and "controlled" in California at the time Petitioner purchased the GBL in 2001 (*see* R.T. 264) misstated neither the testimony nor the law. The prosecutor's argument that it did not matter whether GBL was "regulated" as opposed to "controlled" properly responded to Petitioner's argu-

ment that he allegedly did not know that possession of GBL was unlawful. As indicated above: (1) at the time of Petitioner's purchase in 2001, GBL was regulated under both state and federal law and qualified as a controlled substance analogue under both state and federal law; and (2) at the time of the offense in March of 2002, GBL was a controlled substance in California. The prosecutor's argument that the jury could infer from the evidence that Petitioner possessed the GBL for sale was not improper. *See United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir.1996), *cert. denied*, 519 U.S. 1156, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997) ("It is not misconduct for the prosecutor to argue reasonable inferences based on the record. [citation]"); *United States v. Necoechea*, 986 F.2d 1273, 1276, 1279 (9th Cir.1993) (prosecutor permitted to argue reasonable inferences from the evidence, "including that one of the two sides is lying").

In sum, the Court of Appeal's rejection of Petitioner's prosecutorial misconduct claims was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on Ground Seven of the First Amended Petition.

## VI. *Petitioner's Claims of Ineffective Assistance of Trial Counsel Do Not Merit Habeas Relief.*

### A. *Governing Legal Standards*

To establish ineffective assistance of counsel, Petitioner must prove: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for

---

15. Immediately preceding this question and answer, defense counsel asked whether Gielish was aware that 2002 was the first time GBL became listed as a controlled substance, and Gielish responded that GBL "became listed" but had always been considered an analogue because it metabolized into GHB (R.T. 141).

counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("*Strickland*"). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The court may reject the claim upon finding either that counsel's performance was reasonable or the claimed error was not prejudicial. *Id.* at 697, 104 S.Ct. 2052; *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir.2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.") (citation omitted). For purposes of habeas review under 28 U.S.C. section 2254(d), *Strickland* sets forth clearly established Federal law as determined by the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. at 391, 120 S.Ct. 1495 (citation and quotations omitted).

Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir.2004), *cert. denied*, 546 U.S. 934, 126 S.Ct. 419, 163 L.Ed.2d 319 (2005) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). The court must judge the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. The court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Karis v. Calderon*, 283 F.3d 1117, 1130 (9th Cir.2002), *cert. denied*, 539 U.S. 958, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003) (citation and quotations omitted); *see Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations

omitted). The test is "only whether some reasonable lawyer ... could have acted, in the circumstances, as defense counsel acted." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.) (citations and quotations omitted), *rev'd on other grounds*, 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998); *see also Babbitt v. Calderon*, 151 F.3d 1170, 1173–74 (9th Cir.1998), *cert. denied*, 525 U.S. 1159, 119 S.Ct. 1068, 143 L.Ed.2d 72 (1999) (relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable) (citation and quotations omitted); *Morris v. California*, 966 F.2d 448, 456–57 (9th Cir.), *cert. denied*, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992) (if the court can conceive of a reasonable tactical reason for counsel's action or inaction, the court need not determine the actual explanation). Petitioner bears the burden to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citation and quotations omitted).

### B. *Discussion*

### 1. *Alleged Failure to "Research Laws on GBL," to Argue that Petitioner Lawfully Purchased the GBL, and to Object to the Prosecutor's Asserted Misstatements of the Law*

 Petitioner contends that defense counsel failed adequately to research the law on GBL, so as to permit counsel to argue that Petitioner lawfully purchased the GBL, and failed to object to the prosecutor's alleged misstatements of the law concerning GBL. These contentions are without merit for several reasons. First, Petitioner has not shown a reasonable probability of a different result had counsel argued that Petitioner lawfully purchased the GBL in 2001, because the issue

at trial was whether Petitioner unlawfully possessed the GBL for sale in March of 2002. Second, Petitioner's argument that federal law did not proscribe the consumption of GBL is beside the point; again, Petitioner was convicted of possession for sale of GBL, not consumption of GBL. Third, Petitioner's underlying assumption, that possession for sale of GBL was not unlawful at the time Petitioner purchased the GBL in 2001, is incorrect. At that time, both state and federal law regulated the possession of GBL, and GBL qualified as an analogue of GHB under both state and federal law. Petitioner has not shown he fell within the category of persons authorized to possess GBL at that time. Fourth, as discussed above, the prosecutor did not make false statements in closing argument. Accordingly, Petitioner's counsel reasonably could have determined that objecting to the prosecutor's closing argument would have been futile.

## 2. *Alleged Failure to Present Expert Witnesses*

Petitioner contends counsel ineffectively failed to call two defense experts, Michael Levine and Matt Allen. This contention is without merit.

Plaintiff asserts that Levine, allegedly a former DEA agent with thirty-eight years' experience in drug law enforcement and experience as a trial consultant and expert witness, would have testified that there was no proof of sales because there was no evidence of pay-and-owe sheets or weapons (FAP Mem., Ground Six, p. 15). Levine also allegedly would have explained how the DEA failed to "follow up on any proof" after allegedly being supplied with Petitioner's bank records, how the agents

conducted an "unprofessional" search and seizure and "violated the national drug policy," and how there were "errors and problems linking the assets to the sale charge" (FAP Mem., Ground Six, p. 15). In support of these allegations, Petitioner attaches to the First Amended Petition a purported declaration of Levine dated October 6, 2003, apparently prepared and submitted to the court in forfeiture proceedings concerning property seized in connection with the offense (FAP, Ex. A). *See United States v. $58,422.00 in U.S. Currency*, CV 03–602–RGK (FMOx).[16] In his declaration, Levine criticized the investigation performed in Petitioner's case, and opined that the presence of a large sum of cash in small denominations and money counters "may be indicative" of drug trafficking, but the presence of such items "without sufficient and standard investigative corroboration" is "no more indicative of drug trafficking than other large scale criminal enterprises" (FAP, Ex. A, p. 6). Levine also opined that in the absence of evidence of Petitioner's reputed involvement in drug sales or a declaration of any agent, there was insufficient "linkage" between the seized assets and drug trafficking (FAP, Ex. A, pp. 6–7). Levine purportedly found significant the asserted absence of "all indicia of drug sales" including such things as "pay-owe ledgers" and weapons and financial records supportive of drug trafficking (FAP, Ex. A, p. 7). Levine concluded that he found it "no more likely that the defendant [sic] assets seized were related to drug trafficking than any other criminal enterprise up to and including the evasion of taxes" (FAP, Ex. A, p. 12).

**16.** The Court takes judicial notice of the docket and file in *United States v. $58,422.00 in U.S. Currency*, CV 03–602–RGK (FMOx). *See Mir v. Little Company of Mary Hosp.*, 844 F.2d at 649. In this *in rem* action, the District Court granted summary judgment for the government, resulting in the forfeiture of cash, the Ford truck, and two items of jewelry seized from Petitioner. The Ninth Circuit affirmed the decision in *United States v. $58,422.00 in U.S. Currency*, 154 Fed.Appx. 20 (2005).

Petitioner's counsel reasonably could have chosen not to call Levine. Notably, in the forfeiture case, the District Court determined that Levine's declaration was insufficient to defeat summary judgment for the government, because "Levine acknowledge[d] that [Petitioner's] inconsistent statements as well as the presence at Petitioner's residence of a money counting machine, large amount of cash in small denominations, and bundled currency [were] consistent with drug trafficking" (*see* Order re Plaintiffs' Motion for Summary Judgment, filed November 10, 2003, in *United States v. $58,422.00 in U.S. Currency,* CV 03–602–RGK (FMOx)).[17] A reasonable attorney could have concluded that any defense testimony by Levine likely would not have undermined the incriminating nature of the 3564 grams of GBL in unlabeled bottles, $34,500 in cash, a money counter, and a hairspray can with a secret compartment. Furthermore, in light of the prosecution's evidence of possession for sale, Petitioner has not shown a reasonable probability that Levine's testimony would have produced a different trial result.

Petitioner contends Allen, an alleged body builder, personal fitness trainer and nutritionist, would have testified that 54 bottles of GBL is a "small amount" which is "not enough for sale but is used as a six month cycle and is used as a dietary supplement" (FAP, Ground Six, pp. 16–17). According to Petitioner, Allen would have explained what "Re–Nutrient" is, and would have testified that a person would use three to four bottles a week during a normal cycle workout program (FAP, Ground Six, p. 1). Allen also allegedly would have testified that in the body building industry GBL was "secretly used" by distributers and sold under different names, such that a "normal citizen" would not know it was controlled (FAP, Ground Six, p. 17). Allen allegedly would have testified that it would be "wize [sic] to purchase 2 boxes of RE–NUTRIENT to get a better price [and] save the hastle [sic] of going on the Internet numerous times to individually buy this supplement" (FAP, Ground Six, p. 17).

Even assuming, *arguendo,* that Allen would have been willing to testify as Petitioner contends [18] (and assuming the court would have allowed such allegedly expert testimony), Petitioner has not shown a reasonable probability of a different outcome. Allen's purported testimony would not have undermined the significance of Petitioner's testimony admitting that Petitioner told Officer Ball the substance in the bottles did the "same thing" as GHB, or Officer Ball's testimony indicating Petitioner told Ball the substance in the bottles was "like GHB" and felt like GHB "after you eat it" (R.T. 58). Moreover, Allen's alleged expert testimony concerning the supposed wisdom of purchasing a purported six-month supply of GBL would not have disturbed the inculpatory significance of the 54 unlabeled bottles containing a total of 3564 undiluted grams of GBL, the money counter, the hairspray can with a secret compartment, or Petitioner's wholly unconvincing efforts to explain how Petitioner came to possess $34,500 in cash, mostly in $20 bills. Therefore, Petitioner has not shown *Strickland* prejudice.

### 3. *Alleged Failure to Object to Asserted Prosecutorial Misconduct*

Petitioner's claims that his counsel ineffectively failed to object to asserted prosecutorial misconduct lack merit because, for

---

**17.** Petitioner testified in his criminal case on November 13, 2003 (R.T. 183).

**18.** Petitioner provides no declaration from Allen or other evidence showing Allen would have been willing so to testify.

the reasons discussed in Section V above, no misconduct occurred. Hence, counsel's failure to object was neither unreasonable or prejudicial.

### 4. Alleged Ineffectiveness in Allowing Petitioner to Be Impeached by a Prior Battery Conviction

Under California law, testifying defendants can be impeached with evidence of prior felony convictions involving moral turpitude. See Cal. Const., Art. I, section 28(f); People v. Castro, 38 Cal.3d 301, 211 Cal.Rptr. 719, 696 P.2d 111 (1985). At trial, Petitioner's counsel conceded that all three of the alleged prior convictions involved moral turpitude (see R.T. 177). The trial court ruled that one of the 1998 convictions could be used as impeachment, and told Petitioner's counsel that counsel could choose which one (R.T. 178). During Petitioner's testimony on direct examination, Petitioner's counsel asked Petitioner whether he had suffered a prior felony conviction for battery causing serious bodily injury, and Petitioner responded affirmatively (R.T. 202). Petitioner contends that, under People v. Mansfield, 200 Cal. App.3d 82, 245 Cal.Rptr. 800 (1988), Petitioner's battery conviction was not a crime of moral turpitude (FAP Mem., Ground Six, p. 5). The Court of Appeal rejected Petitioner's claim, ruling that: (1) defense counsel had contributed to any error; and (2) Petitioner had not shown prejudice because he could have been impeached with the prior assault conviction (Respondent's Lodgment 6, pp. 8–9).

Petitioner has not shown a reasonable probability of a different outcome if counsel had opposed successfully the use of the battery conviction to impeach Petitioner. Petitioner's conviction for assault by means of force likely to cause great bodily injury was a crime of moral turpitude under California law. See People v. Elwell, 206 Cal.App.3d 171, 177, 253 Cal.Rptr. 480 (1988).[19] Impeachment with the assault conviction would have had essentially the same impact as impeachment with the assault conviction. Therefore, as the Court of Appeal reasonably concluded, Petitioner has not demonstrated that any asserted error by counsel prejudiced Petitioner.

### 5. Alleged Failure to Research Petitioner's Prior Convictions, to Object to Use of Petitioner's Battery Conviction as a Strike, and to Present Argument at Sentencing

To the extent Petitioner contends his counsel erred by referring to Petitioner's battery conviction as a strike, Petitioner is mistaken. For the reasons discussed above, the battery conviction qualified as a strike. See People v. Moore, 10 Cal. App.4th at 1871, 13 Cal.Rptr.2d 713.

To the extent Petitioner contends counsel ineffectively failed to research Petitioner's prior convictions, Petitioner does not indicate what information counsel could have learned by any further investigation which would have aided Petitioner. Petitioner appears to assert that a further investigation would have caused counsel to argue the prior convictions showed only one strike, and would have led the court to impose a sentence based on only one strike (see FAP Mem., Ground Six, pp. 2–3, 5, 7). However, Petitioner did receive a sentence based on only one strike. As indicated

---

**19.** To the extent Petitioner faults counsel for asking Petitioner about his prior battery conviction on direct examination, Petitioner has not shown his attorney acted outside the range of reasonable competence. See Smith v. Stewart, 140 F.3d 1263, 1273 (9th Cir.), cert. denied, 525 U.S. 929, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998) (counsel not ineffective in eliciting defendant's testimony concerning prior convictions, where convictions were related to alibi defense and counsel's questioning was "a way of drawing the sting from any impeachment of Smith with those crimes when he testified").

above, the court struck the 1998 assault conviction and imposed a sentence based on only one strike, the battery conviction. Therefore, Petitioner has not shown a reasonable probability that any further investigation by counsel would have produced a different outcome.[20]

Petitioner's argument that counsel ineffectively failed to "present argument" at sentencing lacks merit. Petitioner contends counsel should have presented "mitigating facts" concerning the 1998 strike, such as the asserted facts that Petitioner allegedly did not use a weapon or intend to inflict injury, that the victim allegedly was not particularly vulnerable, that Petitioner allegedly was provoked, that the victim's injuries were the result of an "accident," and that Petitioner allegedly was remorseful (FAP, Ground Six, p. 3).

Petitioner's counsel did inform the court that at the preliminary hearing in the 1998 case the court had dismissed the allegation that Petitioner had used a beer bottle (R.T. 361–62). However, the sentencing court also had before it a probation report showing that: (1) the victim in the 1995 case suffered five chipped teeth, four stitches to the knee, bruises to the face and head, and a swollen lip; and (2) the victim in the 1998 case suffered a compound dislocation fracture of the nasal nasomaxillary complex and lacerations to the cheek and eyebrow which required stitches, and underwent reconstructive surgery (C.T. 200–16; R.T. 360). The court concluded that the probation report made Petitioner "look like a bully" (R.T. 367–68).

"Extraordinary must the circumstance be by which a career criminal can be deemed to fall outside the spirit of the very statutory scheme within which he squarely falls and whose continued criminal career the law was meant to attack." *People v. Strong,* 87 Cal.App.4th 328, 332, 104 Cal.Rptr.2d 490 (2001). Given the fact that the court already had dismissed one of the 1998 strikes, and given the content of the probation report, it is not reasonably probable that Petitioner would have received a more lenient sentence had Petitioner's counsel presented all allegedly "mitigating facts."

Petitioner argues counsel ineffectively failed to argue at sentencing that Petitioner was an innocent man who bought the GBL legally without knowing what the bottles contained, and retained the GBL without knowing the law had changed (FAP, Ground Six, pp. 8–9). The jurors who heard Petitioner's purported explanations for his possession of the GBL found Petitioner guilty. Counsel reasonably could have determined that repeated, unconvincing protestations of Petitioner's innocence would not persuade the court to impose a more lenient sentence.

Petitioner also contends counsel failed to remind the judge that the judge assertedly had agreed previously to give Petitioner probation (FAP, Ground Six, pp. 8–9). Petitioner provides no support for his statement that the judge previously had promised to give Petitioner probation, and nothing in the record supports this assertion. Petitioner's conclusory allegation, without factual support, does not suffice to show counsel's ineffectiveness. *See Jones v. Gomez,* 66 F.3d 199, 205 (9th Cir.1995), *cert. denied,* 517 U.S. 1143, 116 S.Ct. 1437, 134 L.Ed.2d 559 (1996) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

---

**20.** Petitioner's allegations that counsel acted ineffectively with respect to the 1995 strike allegation lack merit. The court deemed that conviction not to constitute a strike. Petitioner has not shown a reasonable probability that, had counsel acted as Petitioner urges, Petitioner would have received a more lenient sentence.

**6. *Alleged Failure to Object to Imposition of High Term***

Petitioner argues his counsel ineffectively failed to object to the imposition of a high term based on Petitioner's prior convictions, on the ground that the court previously had found not true the 1995 strike allegation (FAP Mem., Ground Six, p. 6). However, the dismissal of a strike allegation does not prevent a California sentencing court from using the fact of the prior conviction as a sentencing factor. *See In re Varnell*, 30 Cal.4th 1132, 1139, 135 Cal. Rptr.2d 619, 70 P.3d 1037 (2003). Dismissal of a prior conviction allegation is "not the equivalent of a determination that defendant did not in fact suffer the conviction." *Id.* (quoting *People v. Burke*, 47 Cal.2d 45, 51, 301 P.2d 241 (1956)). Hence, counsel reasonably could have concluded that any such objection would be meritless. *Strickland* did not obligate counsel to make a meritless objection. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996), *cert. denied*, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997) ("the failure to take a futile action can never be deficient performance"); *Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir.), *cert. denied*, 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989) ("[T]he failure to raise a meritless legal argument does not constitute ineffective assistance of counsel"; citation and internal quotations omitted).

Petitioner further alleges counsel should have objected to the court's determination that Petitioner's prior crimes were of increasing seriousness (FAP Mem., Ground Six, p. 6). Counsel reasonably could have determined that the court would have overruled any such objection. The probation report included information that in the 1998 offense, unlike the earlier offense, the victim had to undergo reconstructive surgery to his face. In any event, Petitioner has failed to demonstrate a reasonable probability that an objection by counsel would have altered the conclusion of the court.

Petitioner further faults counsel for failing to object to an alleged dual use of facts at sentencing, *i.e.*, the use of Petitioner's prior battery conviction both as a strike and to support an upper term sentence (FAP Mem., Ground Six, p. 7). California Penal Code section 1170(b) forbids a court from imposing an upper term sentence "by using the fact of any enhancement upon which sentence is imposed under any provision of law." However, "[t]he Three Strikes Law ... articulates an alternative sentencing scheme for the current offense rather than an enhancement." *People v. Superior Court (Romero)*, 13 Cal.4th 497, 527, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996) (citations omitted). Therefore, Petitioner's counsel reasonably could have concluded that it was not unlawful to use Petitioner's prior battery conviction both as a strike and to support an upper term sentence. *See People v. Cressy*, 47 Cal. App.4th 981, 990–92, 55 Cal.Rptr.2d 237 (1996) (prior conviction could be used as a strike and to impose prior prison term enhancement pursuant to California Penal Code section 667.5(b)). Therefore, counsel's failure to act in the manner suggested by Petitioner was not ineffective. *See Rupe v. Wood*, 93 F.3d at 1445; *Shah v. United States*, 878 F.2d at 1162.

Finally, Petitioner apparently contends his counsel should have objected to the sentence on the ground that the jury did not find true the facts supporting the imposition of the upper term (FAP Mem., Ground Six, p. 7). Counsel reasonably could have determined that Petitioner's waiver of a jury trial on the prior conviction allegations foreclosed any such objection. *See Blakely*, 542 U.S. at 310, 124 S.Ct. 2531 ("nothing prevents a defendant from waiving his *Apprendi* rights"; "a defendant who stands trial may consent to

judicial factfinding as to sentence enhancements"). Moreover, for the reasons discussed in Section IV above, counsel reasonably could have determined that, regardless of any waiver, the Constitution did not entitle Petitioner to a jury finding on the issue of Petitioner's criminal history. *See Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348; *Almendarez–Torres v. United States,* 523 U.S. at 247, 118 S.Ct. 1219. Counsel also reasonably could have determined that, in light of Petitioner's criminal history, the statutory maximum for *Blakely* purposes was the upper term. *See People v. Osband,* 13 Cal.4th 622, 728–29, 55 Cal.Rptr.2d 26, 919 P.2d 640 (1996), *cert. denied,* 519 U.S. 1061, 117 S.Ct. 696, 136 L.Ed.2d 618 (1997) ("[o]nly a single aggravating factor is required to impose the upper term") (citation omitted). Therefore, counsel's failure to act in the manner suggested by Petitioner was not ineffective. *See Rupe v. Wood,* 93 F.3d at 1445; *Shah v. United States,* 878 F.2d at 1162.

### 7. *Alleged Promise Regarding Petitioner's Sentence*

In a brief, conclusory paragraph, Petitioner alleges his attorney ineffectively promised Petitioner that, if Petitioner went to trial and lost, counsel would "still get [Petitioner] the promised 4 years by the prosecution" (FAP Mem., Ground Six, p. 4). Petitioner does not describe any plea agreement offered by the prosecution (for a four-year term or otherwise), does not allege facts showing that counsel advised Petitioner to decline any such plea agreement, and does not allege facts showing that any such plea offer still existed after Petitioner allegedly elected to go to trial. Nothing in the record supports Petitioner's allegations. Petitioner's conclusory (and improbable) allegations are insufficient to warrant habeas relief. *See Jones v. Gomez,* 66 F.3d at 205.

### 8. *Conclusion*

Petitioner has failed to demonstrate counsel's alleged ineffectiveness. Therefore, the state courts' rejection of Petitioner's claims of ineffective assistance of counsel was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on Ground Six of the First Amended Petition.

### RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) denying and dismissing the First Amended Petition with prejudice.